IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MANUEL A., | ) |
|       Plaintiff, | ) ) ) ) No. 1:20-cv-03844 |
| v. | ) ) Magistrate Judge Jeffrey I. Cummings |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security,[1] | ) ) ) |
|       Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Manuel A. ("Claimant") brings a motion to reverse the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIBs"). The Commissioner brings a motion for summary judgment seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons discussed herein, Claimant's motion to reverse the decision of the Commissioner, (Dckt. #17), is granted and the Commissioner's motion for summary judgment, (Dckt. #20), is denied.

**I.     BACKGROUND**

Claimant first filed a disability application on May 17, 2013, alleging a disability onset date of March 1, 2009. His claim was denied initially and upon reconsideration. On December 9, 2015, Administrative Law Judge ("ALJ") Kimberly S. Cromer issued an unfavorable decision denying Claimant's application for benefits. Claimant appealed to the District Court, which

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to plaintiff only by his first name and the first initial of his last name. Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

1

reversed the ALJ's decision and remanded the case for further consideration. (R. 605-19). On remand, Claimant amended his alleged onset date to November 6, 2012, and indicated that his date last insured was December 31, 2015. (R. 1878-79). ALJ Cromer held a supplemental hearing on March 18, 2019, (R. 515-64), and again denied benefits on May 20, 2019, (R. 1875-1911). The Appeals Council declined to assume jurisdiction, (R. 1868-74), leaving the ALJ's decision as the final decision of the Commissioner. *See* 20 C.F.R. §404.984. This action followed.

### B. The Social Security Administration Standard

To qualify for disability benefits, a claimant must demonstrate that he is disabled, meaning he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). At step two, the SSA determines whether a claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. §404.1521. An impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* In other words, a physical or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind.

Oct. 22, 2019). If a claimant establishes that he has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, she is considered disabled and no further analysis is required. If the listing is not met, the analysis proceeds. 20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess the claimant's residual functional capacity ("RFC"), or his capacity to work in light of the identified impairments. Then, at step four, the SSA determines whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given his RFC, age, education, and work experience. If such jobs exist, he is not disabled. 20 C.F.R. §404.1520(a)(4)(v).

    **C.**    **The Evidence Presented to the ALJ**

Because Claimant's arguments concern only his mental limitations, the Court will limit its discussion of the evidence accordingly.

    **1.**    **Evidence from Treating Physicians**

From May through September 2014, Claimant's primary care physician, Dilip Patel, M.D., prescribed trazodone to treat Claimant's depression and insomnia. (R. 402-03). When Claimant began seeing a new doctor, Deepti Shivakumar, M.D., in October, he continued to

report feelings of depression and frequent crying spells. (R. 407). Dr. Shivakumar started Claimant on Lexapro, increased his dosage of Gabapentin, and referred him to a psychiatrist. (R. 406-07).

Psychiatrist Evan Deranja, M.D., began treating Claimant on March 17, 2015. At that time, Claimant reported experiencing depressed mood, insomnia, anhedonia, feelings of guilt and worthlessness, poor energy, poor concentration, and decreased appetite. (R. 443). Claimant reported that his concentration had worsened over time – a change which he suspected led to him losing his job. (*Id.*). Dr. Deranja noted that Claimant was taking Lexapro and Ambien daily, with no benefit. (R. 445). He observed psychomotor retardation, depressed mood with a constricted affect, and cognitive difficulties. (R. 445-46). He concluded that Claimant was experiencing a "major depressive episode – single episode – [that had] been worsening for the past [one to two] years" and a "cognitive disorder not otherwise specified." (R. 446).

Regarding the cognitive disorder, Dr. Deranja explained that Claimant's "symptoms of depression [were] complicated by some significant potential contributing factors," possibly related to Claimant's history of exposure to paint fumes from his three-decade career as a painter. (R. 443). In particular, Dr. Deranja suspected that Claimant suffered from a syndrome known as chronic solvent-induced encephalopathy ("CSE"), which he theorized played a larger role in Claimant's mental limitations than depression or anxiety. (R. 446). He increased Claimant's dosages of Lexapro and trazodone and referred him for cognitive testing. (R. 443).

Dr. Deranja administered the Montreal Cognitive Assessment ("MoCA Test") – a cognitive screening exam for early detection of mild cognitive impairment – to Claimant on September 28, 2015. Claimant scored a thirteen out of thirty, indicating significant defects. (R. 455). Dr. Deranja noted that it would "still be helpful for [Claimant] to have formal

4

neurocognitive testing," as he was "not sure if MoCA [was] enough" to verify the existence of CSE. (R. 456). He again hypothesized that some of Claimant's "difficulties with memory, thinking, etc. . . . may be caused from [his] inhalation of paint solvents for [thirty plus] years," and referred Claimant for a neuropsychological examination. (*Id.*). Despite Dr. Deranja's recommendation, Claimant never received this testing because his insurance would not cover it. (R. 58, 522-23).

Dr. Deranja completed a Mental Impairment Report on Claimant's behalf on October 6, 2015. In it, he noted that Claimant suffered from depressive disorder and "cognitive disorder not otherwise specified." (R. 429). He endorsed symptoms of depressed mood, anhedonia, insomnia, impaired concentration, daily headaches, a tendency to be easily overwhelmed, decreased appetite, decreased energy, feelings of guilt and worthlessness, and psychomotor retardation. According to Dr. Deranja, Claimant's depression caused moderate limitations in activities of daily living and maintaining social functioning, as well as marked limitations in maintaining concentration, persistence, or pace. (*Id.*). Comparatively, he found that Claimant's unidentified cognitive disorder caused marked limitations in all four functional categories. (R. 432) ("While depression is a confounder, this author suspects that his cognitive deficits extend beyond that seen with depression.").

Dr. Deranja was still seeing Claimant on March 5, 2019, when he wrote a letter summarizing Claimant's treatment history. He again indicated that Claimant's symptoms of depression were "complicated by significant potential contributing factors, most notably his exposure to various chemicals when he was a painter for [thirty] years." (R. 1865). He also reiterated that: (1) "formal neurocognitive testing would be very helpful in assessing more details

5

of his current cognitive strengths and limitations," (2) the 2015 MoCA testing evidenced a serious cognitive disorder, and (3) Claimant struggled with activities of daily living. (*Id.*).

### 2. Evidence from Medical Expert Testimony

Psychological medical expert Jeffrey Andert, Ph.D., testified at Claimant's March 18, 2019 supplemental hearing. He confirmed that the record supports a diagnosis of major depressive disorder, which he characterized as recurrent and moderate. (R. 522).

Dr. Andert acknowledged that Claimant's 2015 MoCA score suggested "extremely poor functioning," and that an individual performing at this level would have a great deal of difficulty even with day-to-day functioning. (*Id.*). He further explained that "it would be unlikely" for Claimant's score to be attributable solely to depressive symptoms, as depression "would not account . . . for cognitive deficits at that estimated level." (R. 533). He acknowledged Dr. Deranja's theory that Claimant had a cognitive impairment, but opined that there was insufficient evidence to confirm this theory. (R. 523). Dr. Andert agreed that a neuropsychological investigation would have been appropriate to confirm the existence of a cognitive impairment. (R. 522).

Dr. Andert concluded that Claimant had only moderate limitations in each functional category. (R. 524-25). He recommended that Claimant be limited to simple, routine, and repetitive tasks, with no fast-paced work on a routine basis. (R. 525). He added that Claimant could work toward a daily quota of productivity and could tolerate and engage in a full range of interaction with coworkers, supervisors, and the public. (R. 526). Dr. Andert based these findings "on the record as it stands, absent any support for the suspicion of any cognitive deficits." (R. 524).

### D. The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant did not engage in substantial gainful activity from his alleged onset date of November 6, 2012, through his date last insured. (R. 1880). At step two, she determined that Claimant suffered from the severe impairments of diabetes mellitus, peripheral neuropathy, degenerative disc disease, insomnia, depression, and anxiety. (*Id.*). At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments, including listing 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). (R. 1884).

Before turning to step four, the ALJ determined that Claimant had the RFC to perform sedentary work with several physical limitations and the following non-physical limitations:

> He was limited to simple, routine, repetitive work with no interaction with the public as part of routine job duties. He could have only occasional interaction with coworkers and supervisors. He could have no fast-paced production assembly line work or work where a machine is setting the pace, but allowing for work at a variable rate. He could do no tandem work.

(R. 1888). At step four, the ALJ determined that Claimant could not have performed his past relevant work as a paint line supervisor or production supervisor through his date last insured. (R. 1901). Even so, at step five, the ALJ concluded that a sufficient number of jobs existed in the national economy that Claimant could have performed given his RFC, age, education, and experience, including the representative jobs of sorter, document preparer, and circuit board assembler. (R. 1902). As such, the ALJ found that Claimant was not under a disability at any time from November 6, 2012, through December 31, 2015. (R. 1903).

## II. STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul,* 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

8

III.     ANALYSIS

Because the ALJ failed to develop a full and fair record, as was her duty, this case must be remanded for further consideration. "While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009), (citing *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir.1991)). Although this duty is "heightened" when a claimant appears pro se, *Skinner v. Astrue*, 478 F.3d 836, 841 (2007), it applies "[e]ven when a claimant is represented by counsel," *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). Failure to fulfill this obligation is "good cause" to remand for the gathering of additional evidence. *Thompson*, 933 F.2d at 586.

In this case, Claimant argues that the ALJ failed to adequately develop the record when she chose not to order neuropsychological testing to verify whether Claimant suffered from a cognitive disorder. (Dckt. #17 at 11). Because the Court agrees that this omission prejudiced Claimant, a remand to the SSA is warranted. Although the Court need not (and does not) address Claimant's remaining arguments, *see, DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019), this decision should not be construed as a comment on the merits of those arguments, which Claimant is free to assert on remand.

### A.     Without additional neuropsychological testing, the ALJ lacked sufficient evidence to determine whether Claimant was disabled.

"It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck*, 357 F.3d at 702 (citing 20 C.F.R. §404.1512(c)). Even so, an ALJ's duty to seek additional evidence is triggered when "the evidence before her is insufficient to determine whether a claimant is disabled or, if after weighing the conflicting evidence, she cannot reach a conclusion." *Luna v. Shalala*, 22 F.3d

9

687, 693 (7th Cir. 1994). Courts "generally uphold[] the reasoned judgment of the ALJ on how much evidence to gather." *Nelms*, 553 F.3d at 1098. Accordingly, "a significant omission" is usually required before courts will find that an ALJ failed to fulfill this duty. *Id.* (citing *Luna*, 22 F.3d at 692). An omission is "significant" only if it is prejudicial. *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). In this case, the Court finds that it was.

The ALJ did not consider any limitations stemming from Claimant's cognitive impairment. Instead, she cited Dr. Andert's testimony that the evidence in the record was "insufficient to support a cognitive impairment" at least *eight times* throughout her decision. Most notably, she relied on this testimony when assessing only moderate limitations in the paragraph B categories, (R. 1882-1883, 1885, 1897), when explaining her decision to give little weight to Dr. Deranja's 2015 report finding that Claimant had marked limitations in all four functional categories, (R. 1889), and when explaining her decision to give little weight to Dr. Deranja's 2019 letter finding Claimant struggled with activities of daily living, (*Id.*).

By repeatedly relying on this portion of Dr. Andert's testimony in order to avoid assessing limitations that may have stemmed from Claimant's undiagnosed cognitive disorder, the ALJ disregarded the District Court's clear warning that she was not permitted to "rely on the absence of [neuropsychological testing] to support a finding that [Claimant] is not disabled if he is financially unable to obtain the testing." (R. 618) (citing *Spies v. Colvin*, 641 Fed.Appx. 628, 634-35 (7th Cir. 2016)). *See Smith*, 231 F.3d at 437-38 ("If the ALJ was concerned that the medical evidence was insufficient to determine whether Mr. Smith was disabled, he should have ordered more recent X-rays."); *Delph v. Berryhill*, No. 1:16-cv-02461-TWP-DML, 2018 WL 816856, at *5 (S.D.Ind. Jan. 23, 2018) (finding the ALJ erred by failing to order additional

10

testing when "the *absence* of this testing was one of the ALJ's explicit reasons for giving the opinion of [claimant's] treating neurologist 'little to no weight'").

This error was particularly prejudicial because Dr. Deranja theorized that *most of* Claimant's mental limitations stemmed from his cognitive disorder, rather than his depression or anxiety. (R. 446). He further hypothesized that Claimant's CSE caused marked limitations in all four paragraph B categories. (R. 432). These theories found support in Claimant's low score on the MoCA test, which Dr. Andert testified would not have been caused by depression alone. (R. 533). In light of this objective evidence supporting the existence of a cognitive impairment, Claimant's inability to pay for such testing due to insurance constraints, and the evidence suggesting that said impairment caused limitations that could theoretically prevent Claimant from obtaining work, the ALJ was obligated to develop the record further. 20 C.F.R. §404.1529(b) (an ALJ "must develop evidence regarding the possibility of a medically determinable mental impairment when the record contains information to suggest that such an impairment exists").

> **B. The Court is not convinced that the ALJ would reach the same result if additional testing were ordered on remand.**

The Commissioner next argues that even if additional testing had been necessary at the initial hearing, it was too late to order the testing when the ALJ reconsidered the case in 2019. Because Claimant's alleged disability period spanned from November 6, 2012, to December 31, 2015, the Commissioner asserts that "any results of a neuropsychological evaluation performed after the Appeals Council remanded the matter back to the ALJ in July 2018 – no matter what they might show – could not establish plaintiff's condition during the period at issue." (Dckt. #21 at 13). Again, the Court disagrees.

Medical evidence post-dating a claimant's disability period is "relevant to the extent it may reflect the claimant's impairments on a prior date." *Jones v. Saul*, 823 Fed.Appx. 434, 439 (7th Cir. 2020) (citing *Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013)). Medical experts might even provide a "retrospective diagnosis" dating back to the disability period, which could support a finding of a past impairment that would have to be accounted for in a claimant's RFC. *See, e.g., Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006) (retrospective diagnosis of PTSD supported finding of past impairment); *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998) ("A physician's retrospective diagnosis is a medical opinion of the claimant's impairments which relates back to the covered period."). "What is required [to establish a retrospective diagnosis] is contemporaneous corroboration [contemporaneous with the period of coverage, that is] of the mental illness, . . . not necessarily contemporaneous medical corroboration." *Wilder v. Apfel*, 153 F.3d 799, 802 (7th Cir.1998).

In other words, the diagnosis can "relate back" so long as it is corroborated by evidence – whether medical or lay – derived from the claimant's period of disability. *Allord*, 455 F.3d at 822, *quoting Newell v. Commissioner of Social Security*, 347 F.3d 541, 547 (3d Cir.2003). Furthermore, it is not enough for a diagnosis to relate back: there must also be evidence of limitations *stemming from* that diagnosis that also pre-dated the expiration of the insured period. *See Estok*, 152 F.3d at 640 ("It is not enough to show that [claimant] had received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured period, since fibromyalgia is not always (indeed, not usually) disabling.").

In this case, if Dr. Deranja was correct to presume that Claimant contracted CSE during his time as a painter, it is possible that a retrospective diagnosis could have been made in 2019.

CSE has been shown to cause "irreversible damage to the [central nervous system],"[2] and an effective treatment for the condition does not exist.[3] Accordingly, if Claimant acquired the condition prior to or during his period of disability, it could have been diagnosed years later. Furthermore, because the record contains evidence from *during* Claimant's disability period that corroborates the existence of a cognitive impairment *and* the limitations that this impairment caused – namely, the MoCA test results and Dr. Deranja's treatment notes – a post-2015 diagnosis could "relate back" and support the existence of a cognitive impairment during Claimant's disability period. This is especially likely given the fact that "CSE is a non-progressive disease with no severe deterioration after cessation of exposure,"[4] meaning that Claimant – who has not worked as a painter since his period of disability – could not have acquired the impairment since his date last insured, nor could the impairment have worsened in the intervening years.[5] Accordingly, the Court finds that the ALJ had a duty to supplement the record with neuropsychological testing in order to determine the existence of a cognitive impairment.

Finally, because CSE is *irreversible*, the same possibility of a retrospective diagnosis exists today. In other words, because of the nature of CSE and the facts regarding Claimant's

---

[2] Gert van der Laan, *Chronic Solvent-induced Encephalopathy: A step forward*, 33 NeuroToxicology 897 (Aug. 2012).

[3] Evelien van Valen, et al., *Chronic solvent-induced encephalopathy: course and prognostic factors of neuropsychological functioning*, 91(7) International Archives of Occupational Environmental Health 843 (Jun. 25, 2018).

[4] *See* n. 4, *supra*.

[5] For these same reasons, the Commissioner's argument that the ALJ "was not allowed" to order testing on remand is also unfounded. The Commissioner cited 20 C.F.R. §404.1519b(c), which provides that the SSA will not pay for additional testing when a claimant's "insured status expired in the past and there is *no possibility* of establishing an onset date prior to the date [his] insured status expired." As explained above, there was a possibility of establishing an earlier onset date through additional testing at the time of Claimant's 2019 hearing.

13

exposure to paint fumes, testing today could confirm that Claimant's cognitive disorder arose during his disability period and caused functional limitations. These facts leave the Court unconvinced that the ALJ will reach the same result on remand. *Karr*, 989 F.3d at 511 (an error is harmless only if the court is convinced that the ALJ would reach the same result on remand).

## CONCLUSION

For the foregoing reasons, Claimant's motion to reverse the Commissioner's decision to deny him DIBs, (Dckt. #17), is granted and the Commissioner's motion for summary judgment, (Dckt. #20), is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**ENTERED: September 29, 2022**

**Jeffrey I. Cummings**
**United States Magistrate Judge**